Judge DAVIS authored a Supplemental Opinion Denying Appellant’s Post Judgment Motion for Partial Refund of Filing Fees in which Judge GREGORY joined. Judge NIEMEYER wrote a dissenting opinion.
OPINION
DAVIS, Circuit Judge:
Appellant Don Juan Torres, a/k/a Donald Hautz (“Torres”), while an inmate at a Virginia prison, filed two civil actions against prison officials in federal court; each case was promptly dismissed for failure to state a claim. When he appealed to this court, we ordered, pursuant to the Prison Litigation Reform Act of 1995, Title VIII of Pub.L. No. 104-134, 110 Stat. 1321 (1996), amending 28 U.S.C. § 1915 et seq. (“PLRA”), that Torres pay the filing fees for the appeals even as an indigent prisoner. Consequently, Virginia corrections officials commenced withholding for *240 ty percent of Torres’s “preceding month’s income credited to [his] account” from his prison trust account, rather than the twenty percent mentioned in 28 U.S.C. § 1915(b)(2), to satisfy the filing fee requirement for his two appeals. Torres objected to the forty percent exaction and has filed a motion for a refund of the fees collected from his account in excess of twenty percent.
For the reasons that follow, we conclude, in agreement with Torres, that 28 U.S.C. § 1915(b)(2) permits only twenty percent of an inmate’s preceding month’s income to be withheld from a trust account, notwithstanding that, as here, the inmate had two informa pauperis appeals pending before this court. On the merits of Torres’s request for a refund, however, we conclude that although we have the authority to order a refund, under the circumstances in these cases, we decline to do so.
I.
Torres was an inmate at the Red Onion State Prison (“ROSP”) in Virginia. He filed two civil actions in the United States District Court for the Western District of Virginia against prison officials during his imprisonment. In the first case, Torres complained that prison officials failed to repair a malfunctioning night-light in his prison cell, resulting in a disturbing “strobe” effect. J.A. 4-7. The district court promptly dismissed the action sua sponte pursuant to 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted. Torres v. O’Quinn, No. 7:06-cv-00576-GE C, 2006 WL 2850642 (W.D.Va. Sept. 29, 2006). We affirmed the judgment of dismissal by per curiam opinion. Torres v. O’Quinn, No. 06-7770, 2007 WL 143081 (4th Cir. Jan. 22, 2007) (unpublished). One year later, Torres filed a complaint in district court asserting that a constitutional violation inhered in the prison’s prohibition of his subscription to commercially available pictures of nude women. J.A. 47-72. The district court also dismissed that action (again, sua sponte) pursuant to 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted. Torres v. Johnson, No. 7:07-cv-00398-GEC, 2007 WL 2570217 (W.D.Va. Aug. 31, 2007). Again, upon Torres’s appeal, we affirmed. Torres v. Johnson, No. 07-7340, 2008 WL 2115474 (4th Cir. May 20, 2008) (unpublished).
In connection with each of his two appeals, as an indigent prisoner, Torres proceeded under the relevant sections of the PLRA, filing an Application for Leave to Proceed Without Prepayment of Fees, a Consent to Collection of Fees from Trust Account, and a copy of his trust account statement. J.A. 124-33, 189-91. On November 6, 2006, and February 20, 2008, respectively, we granted each of Torres’s applications, ordering that an initial payment of twenty percent of the greater of his average monthly deposits or monthly balance from the six months before filing of each appeal be collected as an initial payment. J.A. 135-37, 192-94. In each such order, in accordance with the PLRA, we directed prison officials to withhold and forward to the clerk of the district court, twenty percent of Torres’s monthly deposits when his income exceeded $10 until the full filing fee was discharged. Id. In March 2007, ROSP officials began withdrawing money, at the twenty percent rate, from Torres’s account to pay the filing fee for his first appeal. Beginning on June 26, 2008, however, after they received our February 20, 2008, order for the second appeal, ROSP officials began withdrawing forty percent, i.e., twenty percent per appeal. When, periodically, the district court received the funds so with *241 held, it applied the full amount to the filing fee of Torres’s first appeal. J.A. 174.
On September 23, 2008, Torres sent a letter to the district court challenging the propriety of the excessive withdrawals. In this letter, he insisted that there must have been an error in the collection of fees from his prison account. J.A. 175-77. On October 28, 2008, the district court (through its pro se law clerk) responded to Torres and advised him that all the money that had been withheld from his account was being applied to the fee related to the first appeal, and that after that fee is paid in full, the money withheld would then be applied to his second appeal. J.A. 174. The district court also advised Torres that any objection to the amount of withholding should be addressed to this court. Id. We construed Torres’s objection as a motion for return of fees and appointed counsel to present argument on his behalf. The Attorney General of Virginia has entered an appearance to defend the prison’s practice of withholding twenty percent of an inmate’s account (or income, as the case may be) for each and every appeal for which an inmate owed fees, without regard for the twenty percent exaction mentioned in the PLRA. We have jurisdiction to review the propriety of the implementation of our prior orders.[1]
II.
The PLRA, enacted in 1996, changed the landscape of prisoner litigation. Congress required that indigent prisoners filing lawsuits be held responsible for the full amount of filing fees. Section 1915(b) sets forth the requirements for the payment of fees by prisoners filing suit in federal court. If an indigent inmate is unable to pay the full fee at once, he may be ordered to make an initial “partial payment” of the filing fee. After the initial partial payment, such a prisoner goes on a “monthly payment plan” until the filing fee is fully discharged. The portions of § 1915(b) relevant in this case state:
(b)(1) Notwithstanding subsection (a), if a prisoner brings a civil action or files an appeal in forma pauperis, the prisoner shall be required to pay the full amount of a filing fee. The court shall assess and, when funds exist, collect, as a partial payment of any court fees required by law, an initial partial filing fee of 20 percent of the greater of—
(A) the average monthly deposits to the prisoner’s account; or
(B) the average monthly balance in the prisoner’s account for the 6-month period immediately preceding the filing of the complaint or notice of appeal.
(2) After payment of the initial partial filing fee, the prisoner shall be required to make monthly payments of 20 percent of the preceding month’s income credited to the prisoner’s account. The agency having custody of the prisoner shall forward payments from the prisoner’s account to the clerk of the court each time the amount in the account exceeds $10 until the filing fees are paid.
28 U.S.C. § 1915(b)(1) & (2). The question presented here is whether § 1915(b)(2) allows only a maximum of *242 twenty percent to be taken from a prisoner’s monthly income regardless of the number of cases or appeals filed, or does the statute require (or permit) twenty percent be taken each month for each case or appeal that the prisoner files; that is, does the financial exaction from the inmate pursuant to § 1915(b)(2) imply no statutory cap, or can it climb to nearly one hundred percent of the monthly deposits to the trust account?[2]
A.
Although the question is an open one in this circuit, there is a split of authority among our sister circuits: the Fifth, Seventh, and Eighth Circuits have interpreted § 1915(b)(2) to require prisoners to pay twenty percent of their funds towards filing fees per case and per appeal; the Second Circuit has interpreted the statute to cap the payment of fees at twenty percent of the prisoner’s income, regardless of the number of cases or appeals for which the prisoner is indebted.[3] We join the Second Circuit and hold that § 1915(b)(2) requires that no more than twenty percent of an inmate’s monthly income be deducted to pay filing fees, irrespective of the total number of cases or appeals the inmate has pending at any one time. We so hold because we find that the most plausible reading of the statute, in light of Congress’ intent as reflected in legislative history and the structure of the statute, and in the face of a looming constitutional question posed by the alternative interpretation, together dictate that, in no instance should the monthly withholdings for filing fees exceed twenty percent of the inmate’s income from the preceding month.
1.
The Fifth Circuit has concluded that § 1915(b)(1) and (b)(2) are unambiguous and that their meaning can be determined by a plain reading of the statutory language. See Atchison v. Collins, 288 F.3d 177, 180 (5th Cir.2002) (per curiam). The court reasoned that the word “court” appearing in both § 1915(b)(1) and (b)(2) should be read to refer to the “instant action,” separate from previously filed lawsuits. Id. at 180-81. The Fifth Circuit also noted that if it interpreted § 1915(b)(2) to cap withdrawals at twenty percent per inmate, then if an inmate files actions in two different courts, “the clerk” in the statute would refer to two different people — a result that would make it impossible to determine which clerk would collect the fee. Id. at 181. The court rejected the notion that “the court” mentioned in the statute refers to a single court, regardless of the number of suits the prisoner filed, hypothesizing that an inmate could file a civil suit in the Eastern District of Texas and another in the District of Columbia. Id. The Fifth Circuit found that ordering the inmate to pay twenty percent per case would decrease the “confusion” surrounding which courts would receive the fees when a prisoner files more than one suit. Id. Additionally, the Fifth Cir *243 cuit concluded that there was no constitutional quandary with a “per case” interpretation because, according to that court, “the Supreme Court has held that indigent persons have no constitutional right to proceed in forma pauperis.” Id. (citing M.L.B. v. S.L.J., 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996)).
The Fifth Circuit’s concern for consistency is misplaced: although the statute mentions that “the court shall assess ... and collect,” the clerk of the court is responsible for collecting the filing fees only in the sense that the clerk “receives” the fees. Plainly, it is the agency having custody of the prisoner that “collects” the fees, in the sense that the agency “gathers together” the money to make payment to the court clerk. See Random House Unabridged Dictionary 402 (2d ed.1993) (defining “collect”). Under a per inmate collection scheme, a prison would collect the funds to pay the fees accrued by a specific inmate, and then distribute those funds to the appropriate court until that court’s fees are paid in full. After satisfying the first court, the prison would continue to collect funds and use them to pay the next court in sequence. There is no “confusion” in such a scheme requiring “elimination.”
Moreover, the Fifth Circuit’s casual dismissal of the inchoate constitutional impediment to its interpretation of the PLRA filing fee provision is deeply troubling. It simply is not true that “[t]he Supreme Court has held that indigent persons have no constitutional right to proceed in forma pauperis.” Atchinson, 288 F.3d at 181. The very case cited by the Fifth Circuit for that proposition reaches exactly the opposite holding. Specifically, the Supreme Court concluded that a mother in Mississippi could not be denied appellate review in a termination of parental rights action solely because she could not pay the fees to compile the record necessary for appeal, stating, “we hold that Mississippi may not withhold from M.L.B. a record of sufficient completeness to permit proper [appellate] consideration of [her] claims.” M.L.B., 519 U.S. at 128, 117 S.Ct. 555 (citing Mayer v. Chicago, 404 U.S. 189, 198, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971)) (internal quotations omitted).[4] Thus, as the Supreme Court has made clear, there are indeed certain fundamental rights whose vindication in a judicial forum are sufficiently profound that the government may not deny access to that forum on the basis of poverty. Id.
2.
Unlike the Fifth Circuit, the Seventh Circuit has correctly noted that the diffi *244 culty here is not in wrestling with the “plain language” of the statute; rather, the problem is that “[t]he statute does not tell us whether the 20 percent-of-income payment is per case or per prisoner.” Newlin v. Helman, 123 F.3d 429, 436 (7th Cir.1997), overruled in part on other grounds by Lee v. Clinton, 209 F.3d 1025 (7th Cir.2000), and Walker v. O’Brien, 216 F.3d 626 (7th Cir.2000). The court adopted the “per case” interpretation based on its finding that the PLRA was “designed to require the prisoner to bear some marginal cost for each legal activity,” and “[ujnless payment begins soon after the event that creates the liability, this will not happen.” Newlin, 123 F.3d at 436 In other words, the court was concerned that “[a] prisoner could file multiple suits for the price of one, postponing payment of the fees for later-filed suits until after the end of imprisonment,” when collection of the fee would perhaps be difficult or impossible. Id. Finally, dismissing sub silentio the argument that a prisoner might face a constitutionally-suspect limitation on his access to courts if trust fund exactions were not capped at twenty percent and not collected sequentially, the Seventh Circuit reasoned, skeptically, that “[fjive suits or appeals mean that the prisoner’s entire monthly income must be turned over to the court until the fees have been paid— though by then a prisoner is likely to have three strikes and to owe all future filing fees in full.” Id.[5]
We agree with the Seventh Circuit that the PLRA is not ambiguous; rather, it is simply silent. (“The statute does not tell us whether the 20 percent-of-income payment is per case or per prisoner.”). Still, the Seventh Circuit’s reasoning leaves much to the imagination, and does little to advance the necessary statutory analysis. The court employs a number of highly debatable assumptions: (1) that prisoners only file suits that are “frivolous,” “malicious,” or “fail to state a claim upon which relief can be granted,” see 28 U.S.C. § 1915A(b)(1);[6] (2) that most prisoners who file numerous suits are serving relatively short sentences, and thus will be released before all unpaid filing fees can be collected from their trust accounts; and (3) that Congress is powerless to collect unpaid filing fees from prisoners after they are released.[7] We decline to engage in such factfinding under the circumstances here.[8]
*245 3.
The Second Circuit has held that the collection of filing fees under § 1915(b)(2) must be pursuant to the “per inmate” interpretation. Whitfield v. Scully, 241 F.3d 264, 276 (2d Cir.2001). The court acknowledged that a “per inmate” interpretation might create a lesser deterrent for prisoners filing lawsuits because they are able to delay the payment of their filing fees. Nevertheless, the court concluded that the “per case” interpretation could raise the constitutional problem of equal access to the courts by possibly recouping one hundred percent of an inmate’s income for filing fees, and accordingly adopted the “per inmate” interpretation. Id. at 276-77. It stated, “[o]ur resolution of this question ... must be guided by the principle that we should ‘avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question.’” Id. at 277 (quoting Gomez v. United States, 490 U.S. 858, 864, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989)).[9]
B.
1.
On the issue of whether fees are to be collected simultaneously or sequentially, we are called upon to determine what Congress would have done had it thought about the problem, not interpret an ambiguous statute. Cf. Newlin, 123 F.3d at 436. We think the most valuable interpretive clue arising from a focus on the “plain text” of the filing fees provisions of the PLRA is the one urged by counsel for Torres, namely, that § 1915(b)(1)’s specific reference to the “payment of any court fees” (emphasis added) suggests that the twenty percent exaction applies to all court fees, in total. Indeed, we have followed the canon of statutory construction that unless otherwise defined in the statute, “words will be interpreted as taking their ordinary, contemporary, common meaning.” United States v. Lehman, 225 F.3d 426, 428 (4th Cir.2000) (quoting Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979)). Under our own circuit’s statutory construction of the word “any,” the phrase “payment of any court fees” should be construed to mean the “payment of any [and all] court fees.” See United States v. Maxwell, 285 F.3d 336, 341 (4th Cir.2002) (citing Webster’s Third New International Dictionary 97 (2d ed.1981)) (“when the word ‘any’ is ‘used as a function word to indicate the maximum or whole of a number or quantity,’ for example, ‘give me [any] letters you *246 find’ and ‘he needs [any] help he can get,’ the word ‘any’ means ‘all.’ ”); see also Webster’s New Universal Unabridged Dictionary, 96 (1st ed.2003) (defining “any” as “every; all”). Consequently, § 1915(b) requires that no more than twenty percent be taken from an inmate’s monthly income to pay for “all” court fees. So construed, therefore, § 1915(b) as a whole suggests that even if the fees encompass more than one suit and/or appeal, § 1915(b)(1) and (b)(2) forbid deducting more than twenty percent of the inmate’s income for monthly payments of all the court fees from all suits in the aggregate.[10]
2.
But here, as in many statutory interpretation exercises, reliance on text alone can lead to a dead end. Cf. Holloway v. United States, 526 U.S. 1, 7, 119 S.Ct. 966, 143 L.Ed.2d 1 (1999) (“As we have repeatedly stated, ‘ “the meaning of statutory language, plain or not, depends on context.” ’ ”) (citing Brown v. Gardner, 513 U.S. 115, 118, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994) (quoting King v. St. Vincent’s Hospital, 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991))). Unlike the Fifth, Seventh, and Eighth Circuits, we are not persuaded by the concern that prisoners would no longer be held liable for the payment of their filing fees if “only” required to pay a twenty percent maximum of their monthly income regardless of how many suits are filed or appeals noted, and would start filing suits against prison officials willy nilly. First, the “per inmate” reading of § 1915(b)(2) does not relieve inmates of their responsibility under the PLRA of paying their filing fees; it is merely a question of timing and not a waiver of fees at all. An inmate filing suit will still have to fully pay his filing fees. Adopting a “per inmate” interpretation of § 1915(b)(2) would not open up a “floodgate” of litigation from prisoners since prisoners would still be accountable for the filing fees under the PLRA. Second, the PLRA’s “three strikes” provision, 28 U.S.C. § 1915(g), should quell any fear that a twenty percent cap on withdrawals would not provide adequate deterrence to continued filing of frivolous suits. Section 1915(g) prohibits prisoners from filing suits in forma pauperis if they have had three prior suits dismissed as frivolous, malicious, or for failure to state a claim, unless they are in imminent harm of physical danger. 28 U.S.C. § 1915(g).
Furthermore, under a “per case” interpretation, inmates may find themselves in situations where they no longer have any income after the fees are paid. If, for example, the inmate had $10.02 in his account, the prison may start deducting fees since he has a balance over $10. See 28 U.S.C. § 1915(b)(2). Under a “per case” regime, the inmate would have $8.02 left in his account if he had filed one suit, $6.02 left in his account if he had filed two suits, and $0.02 left in his account if he had filed five suits. But see supra note 2. This result is problematic because it is not only contrary to the clear legislative intent of the PLRA, but it also raises an access to courts issue of constitutional dimensions.
3.
We conclude that the admittedly meager legislative history of the PLRA points to the Second Circuit’s approach, that a “per inmate” interpretation is the correct interpretation and both satisfies Congress’ in *247 tent when passing the PLRA and protects the constitutional rights of inmates.
Congress put a limit on garnishment from an inmate’s (already meager) income, understanding that a “chilling effect” on litigation was not the same as a complete bar on filing suits, which may occur if close to one hundred percent of an inmate’s income is taken to pay his filing fees. When enacting the PLRA, Congress was explicit that the intention of the statute was to provide prisoners with “an economic downside to going to court.” 141 Cong. Rec. S7525 (daily ed. May 25, 1995) (statement of Sen. Dole). Congress sought to provide initial deterrents against suits, but not to punish prisoners for electing to litigate. See 141 Cong. Rec. S7526 (daily ed. May 25, 1995) (statement of Sen. Kyi) (“The modest monetary outlay [in § 1915] will force prisoners to think twice about the case and not just file reflexively.”). The garnishment of more than twenty percent of an indigent inmate’s already meager income crosses the line from deterrence to punishment and was not the intent behind § 1915. Specifically, Congress felt that “[t]he filing fee is small enough not to deter a prisoner with a meritorious claim, yet large enough to deter ... multiple filings.” 141 Cong. Rec. S7526 (daily ed. May 25, 1995) (statement of Sen. Kyl).
Furthermore, Congress indicated that the timing of recoupment was not the intended disincentive, but that prisoners would be deterred simply by the requirement that they pay the costs at all. See 141 Cong. Rec. S14413 (daily ed. Sept. 27, 1995) (statement of Sen. Dole) (emphasis added) (“[W]hen prisoners know that they will have to pay these costs — perhaps not at the time of filing, but eventually — they will be less inclined to file a lawsuit in the first place”) (emphasis added).
Congress never intended § 1915(b)(2) to be construed punitively, and in a manner amounting to a denial of a prisoner’s access to courts. See 142 Cong. Rec. 5,118 (1996) (statement of Sen. Reid) (“If somebody has a good case, a prisoner, let him file it.”); 141 Cong. Rec. 27,042 (1995) (statement of Sen. Hatch) (“I do not want to prevent inmates from raising legitimate claims. This legislation will not prevent those claims from being raised.”). Under the Seventh Circuit’s approach, an inmate could file three lawsuits in district court, all of which present colorable and plausible, but ultimately losing, claims. If the district court grants summary judgment against the inmate in each case, the inmate would be foreclosed from pursuing what could be a meritorious appeal in the third case because the three district court filing fees (60%) coupled with the filing fees for the appeals in the first two eases (40%) would exhaust his trust fund account and he could not pay the appellate filing fee, and therefore could not appeal, the adverse summary judgment in the third case. Congress could not possibly have intended this outcome; certainly, federal courts should not provide this answer to a question that Congress never thought about. Cf. Benjamin v. Jacobson, 935 F.Supp. 332, 340 (S.D.N.Y.1996) (“[I]t is worth noting that some believe that this legislation which has a far-reaching effect on prison conditions and prisoners’ rights deserved to have been the subject of significant debate. It was not.”); 142 Cong. Rec. 5, 193 (1996) (statement of Sen. Kennedy) (“The PLRA was the subject of a single hearing in the Judiciary Committee, hardly the type of thorough review that a measure of this scope deserves.”). Our “per inmate” interpretation today holds true to that intent.
4.
Finally, adopting a “per case” regime for § 1915(b)(2) could present a constitutional
*248 problem of access to courts for prisoners. Even if it is true that prisoners often file unmeritorious suits and § 1915(b) is intended to provide a “chilling effect,” prisoners under a “per case” regime may be completely barred from filing meritorious claims.[11] Because prisoners who have had “three strikes” under § 1915(g) must pay the entire filing fee up front at the time the suit is filed, the simultaneous withdrawal of filing fees from previous suits could hinder a prisoner from asking the courts to address serious abuses that may not necessarily result in serious bodily injury or death.[12] See 28 U.S.C. § 1915(g) (creating an exception to the “three strikes” rule for a prisoner who “is under imminent danger of serious physical injury”). Adoption of a “per case” rule would pose genuine risks of constitutional violations and abuses that do not rise to the level of imminent serious physical injury, would never come to the court’s attention because prisoners would hesitate to file complaints; it would place additional burdens on the prisoner’s finances. In essence, a “per case” interpretation of § 1915(b) would force prisoners to choose between saving their meager income and searching for a remedy for abuses in prison. Cf. Beville v. Ednie, 74 F.3d 210, 212 (10th Cir.1996) (“A prison inmate’s right of access to the courts is the most fundamental right he or she holds.” (quoting DeMallory v. Cullen, 855 F.2d 442, 446 (7th Cir.1988))).
III.
Our good colleague dissents on three grounds. First, the dissent contends that we have misinterpreted the applicable provisions of the PLRA. Second, the dissent contends that the case is moot and that we lack “subject matter jurisdiction.” Finally, the dissent asserts this court lacks the power to order a refund of filing fees. We address these contentions in turn.
A.
The dissent’s boldly-stated and confident application of its version of “plain meaning” statutory analysis is as unpersuasive as it is formalistic, consisting of little more than reproducing the statute. The approach bespeaks the kind of mechanical statutory interpretation that can lead a court to stray from the full achievement of congressional goals. See, e.g., Robinson v. Shell Oil Co., 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (rev’g 70 F.3d 325, *249 330 (4th Cir.1995) (holding that “plain meaning” of statutory term “employee” absolutely excludes from its compass a “former employee”)); Graham County Soil & Water Conservation Dist. v. U.S. ex rel. Wilson, 545 U.S. 409, 125 S.Ct. 2444, 162 L.Ed.2d 390 (2005) (rev’g 367 F.3d 245, 251 (4th Cir.2004) (concluding that one statutory subsection “plainly applie[d]” to another subsection)); United States v. Hayes, — U.S.-, 129 S.Ct. 1079, 172 L.Ed.2d 816 (2009) (rev’g 482 F.3d 749, 752 (4th Cir.2007) (determining what statutory provision “plainly require[d]”)). By deeming § 1915(b)(2) “simply” to “latch on” to § 1915(b)(1), Dissenting Op. at 258, the dissent begs the question presented: whether a scheme of pyramiding exactions under § 1915(b)(2), such that virtually the entirety of a prisoner’s income may be garnished to pay court filing fees, comports with Congress’ intent when it undertook a limited and measured approach in deciding to inflict an economic “sting” on inmates who seek redress in federal district court. In deciding the issue at hand as if the question presented has not been presented, the dissent reaches a conclusion unsupported by genuine analysis. Cf. Holloway, 526 U.S. at 7, 119 S.Ct. 966 (“As we have repeatedly stated, ‘the meaning of statutory language, plain or not, depends on context.’ ”) (citations and internal quotation omitted).
The dissent categorizes the payments mandated by § b(l) and § b(2) as “two types of installment payments” that must be collected and paid simultaneously in every case; but in fact, they are materially distinct in purpose and effect.[13] Indeed, the record here discloses a telling fallacy in the dissent’s unwarranted assumptions. Although corrections officials sua sponte withheld 40% of Torres’s income for the payment of fees in the two appeals before us, the district court applied all the funds it received only to the first case. Thus, the actual implementation of the statute in this instance resulted in a deviation from the clear congressional mandate the dissent asserts is unavoidable in a “plain meaning” reading of the statute: that no more than 20% of an inmate’s income be withheld per case. In fact, Torres (now released from custody) has paid 40% of his monthly income in “a [single] case.”
It is also worth noting that, in keeping with the sensible practice of many district courts around the country, the district court in these cases promptly determined that the complaints failed to state a claim upon which relief could be granted and dismissed each case pursuant to 28 U.S.C. § 1915A without bothering to process Torres’s request for in forma pauperis status.[14] Accordingly, Torres quickly earned *250 “two strikes” under the “three-strike” “door-closing” trigger of 28 U.S.C. § 1915(g), which is Congress’ preferred method for barring access to federal district court to mischievous inmates intent on engaging in “recreational litigation.” In any event, contrary to the dissent’s preferred approach, there is absolutely nothing inherent in Congress’ decision to require, in § b(l), an exaction of 20% of the inmate’s “average monthly balance” in his trust account (or “average monthly deposits”) as a “partial payment” of a filing fee at the commencement of each case or appeal, which compels the conclusion that the subsequent “monthly payments,” required by § b(2) to be calculated as 20% of his previous month’s income, must be withheld without regard to the number of cases and appeals pending at the same time.[15]
The dissent scolds us because we forthrightly acknowledge (in agreement with Judge Easterbrook, see Newlin, 123 F.3d at 436, but in disagreement with the per curiam decision of the Fifth Circuit, see Atchison, 288 F.3d at 180) that the PLRA is in a material respect “silent,” requiring us to fathom (unexpressed) congressional intent regarding the sequencing (or not) of the monthly payments assessed pursuant to § b(2). Statutory silence may, see Texas Mun. Power Agency v. EPA, 89 F.3d 858, 869 (D.C.Cir.1996) (“In view of its silence on the point at issue, we must hold the statute ambiguous.”), or may not, see Univ. of Chi. Hosps. v. United States, 545 F.3d 564, 567 (7th Cir.2008) (“[T]he statute’s silence on the specific subject of medical residents does not necessarily mean it is ambiguous.”), give rise to latent statutory ambiguity. At all events, the Supreme Court does not share the dissent’s timidity in this regard. See Stewart v. Dutra Constr. Co., 543 U.S. 481, 487, 125 S.Ct. 1118, 160 L.Ed.2d 932 (2005) (“[T]he statute is silent on who is a ‘seaman.’ ”); Christensen v. Harris County, 529 U.S. 576, 585, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000)(“Because the statute is silent on this issue and because the county’s policy is entirely compatible with § 207(o)(5), petitioners cannot, as § 216(b) requires, prove that the county has violated § 207.”); Demote v. Kim, 538 U.S. 510, 578, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003) (Breyer, J. dissenting) (“I would interpret the (silent) statute as imposing these bail standards.”); Holloway, 526 U.S. at 22, 119 S.Ct. 966 (Thomas, J., dissenting) (“The central difficulty in this case is that the text is silent as to the meaning of ‘intent.’ ”).
Indeed, members of the Supreme Court have noted that at least one provision of the PLRA itself is “silent” in a material respect. See Miller v. French, 530 U.S. 327, 358-59, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000) (“There is no logical inconsistency in saying both (1) a motion (to terminate) “shall operate as a stay,” and (2) the court retains the power to modify or delay the operation of the stay in appropriate circumstances. The statutory language says nothing about this last-mentioned power. It is silent. It does not direct the district court to leave the stay in place *251 come what may.”) (Breyer, J., dissenting) (emphasis added). Similarly here, “[t]here is no logical inconsistency in saying both” (1) § b(l) requires a partial payment for every case or appeal that is filed, and (2) the potentially harsh effects of pyramiding the monthly exactions mandated by § b(2) (not to mention the potentially unconstitutional effects) may be — and should be— ameliorated by ordering that they be paid sequentially rather than simultaneously where more than one case or appeal is pending.[16]
We respect, but take a different view from, the dissent’s credulous observation that governmental appropriation of virtually the entirety of an inmate’s monthly income for the payment of court filing fees does not rise to the level of “punishment.” Congressional and judicial disapprobation of frivolous claims instituted by too-idle prisoners is entirely appropriate; we hon- or Congress’ goal to reduce the incidence of frivolous claims by our holding.[17] On the other hand, only a little more than a fortnight ago, the Supreme Court reminded us that there are limits to official hostility to prisoner litigation. Wilkins v. Gaddy, — U.S. -, 130 S.Ct. 1175, — L.Ed.2d-(2010) (per curiam) (abrogating Fourth Circuit rule that allegation of only de minimus injury precludes Eighth Amendment excessive force claim). As mentioned above, we believe that Congress intended to inflict an economic “sting” on inmates as a disincentive to the filing of meritless claims, not to impose a regime in which an inmate has access to federal district court only at such an oppressive cost as the dissent is willing, if not anxious, to impose.
B.
The dissent also contends that because Torres has been released from prison, see supra n. 1, the PLRA no longer applies to him and therefore, the case is moot. It is said that we are merely issuing an advisory opinion. In their joint post-argument submission to the court, counsel for the parties disagree with the dissent, as do we.
The merits of these appeals have long been decided and there is no unadjudicated “claim” against the named defendants here. The question now before us is whether Torres should get a partial refund of the filing fees paid on his behalf from his prison trust account, not simply whether Torres should only have 20% deducted from his prison account at all times. We ultimately conclude (consistent with Judicial Conference Policy) that he is not entitled to a refund of fees under the circumstances. See infra pages 24-25. Contrary to the assertions in the dissent, however, federal courts plainly and unmistakably have the power to refund a litigant’s payment of an excessive or mistaken filing fee *252 to a litigant, including, in particular, indigent prisoners. See West v. Blair, No. 00-20615, 2001 WL 563818 at *5 (5th Cir. May 15, 2001) (unpublished) (per curiam) (“The district court was within its authority to order that the excess fees ... be returned to the proper prison accounts.... [0]ur court has found that denying indigent litigants a refund of filing fees may violate their right of access to the courts.”) (citing Foster v. City of Lake Jackson, 28 F.3d 425, 429 (5th Cir.1994)).
Relatedly, the dissent suggests that because we have decided to deny a refund of the excessive filing fees paid on behalf of Torres, it follows that any discussion of the harm itself is merely gratuitous. Surely, this is not true. Our constitutional tradition traces at least to Marbury v. Madison, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803), the notion that a court should determine, first, whether there was a legal harm before it undertakes consideration of a remedy. We conclude that the decision whether to refund fees requires of this court an exercise of discretion, but we could no sooner exercise our discretion not to order a refund of fees without first deciding whether there was an “overpayment” in the first instance.
C.
The dissent also claims that, based on sovereign immunity, we have no discretion to fashion a remedy and thus we lack power even to consider whether a legal injury occurred. The dissent is clearly mistaken. First, as we have discussed, federal courts have the authority to refund an overpayment of filing fees, and in fact, have ordered the refund of excessive filing fees. See West, 2001 WL 563818 at *5. Second, sovereign immunity bars claims against the United States for money damages, but has never been interpreted to bar a request to a governmental agency or department simply to recover property or the fair-value of that property erroneously delivered to the government. The difference between the analysis we would conduct in the sovereign immunity context and the discretion afforded us by the policies of the Judicial Conference of the United States to refund excessive filing fees necessitates an analysis of whether the fees were wrongly collected. Manifestly, the refund request in this case illustrates the difference between an analysis of a claim that would not be redressable in the sovereign immunity context, and a request that we clearly may remedy at our discretion. In short, this case does not call into question our Article III powers to adjudicate the merits of Torres’s motion for a partial refund of filing fees.
IV.
We hold that 28 U.S.C. § 1915(b)(2) caps the amount of funds that may be withdrawn from an inmate’s trust account at a maximum of twenty percent regardless of the number of cases or appeals the inmate has filed. Accordingly, the Warden of Red Onion State Prison shall collect and remit to the clerk of the United States District Court for the Western District of Virginia, and the clerk shall accept, no more than twenty percent of an inmate’s preceding monthly income or trust account balance, as the case may be, as payment toward his filing fees obligation.
Torres has now been released from custody and during his imprisonment, he fully complied (indeed, under our holding, more than fully complied) with his PLRA payment obligations for these appeals. Accordingly, under our precedent, he is absolved from further payments. See DeBlasio, 315 F.3d at 397. Nevertheless, under the circumstances, although federal courts have the authority to order a refund of excessive filing fees, we decline *253 to grant a partial refund of fees to Torres. The amounts withheld from his trust account and remitted on his behalf during his incarceration were actually owed and properly (if excessively) collected. Cf. West, 2001 WL 563818 at *5 (approving district court order granting refund where two prisoners, as joint plaintiffs, overpaid filing fees for a single case filed in district court). Were he still incarcerated, Torres would have been entitled, at the least, to a temporary abatement in the collection of fees from his prison account. We conclude, however, that there is no unfairness, under the circumstances, in declining to order the district court clerk to effect a refund.
* * * if: * *
For the reasons set forth, the motion for partial refund of fees is

DENIED.

. Because the continuing collection of appellate filing fees is ancillary to this court's original jurisdiction over Torres's appeals, we have jurisdiction to decide this issue. See Peacock v. Thomas, 516 U.S. 349, 354, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996) (finding that federal courts may exercise ancillary jurisdiction to enforce its judgments).
We note that, in response to an order we issued after argument, counsel for the parties have confirmed that, as disclosed by a search of public records, Torres has been released from the Virginia prison system. See http://www.vadoc.virginia.gov/offenders/locator/ index, cfm. Nevertheless, as counsel have urged, the case presents no issue of mootness. See infra pp. 251-52.

. Presumably, inasmuch as Congress ordered that the twenty percent periodic withdrawal from an inmate’s trust account would only be proper when "the amount in the account exceeds $10,” 28 U.S.C. § 1915(b)(2), the withdrawals could never cause an inmate’s trust account to fall below $8.01.

. The D.C. Circuit has suggested in dicta that it would follow the Second Circuit’s approach. See Tucker v. Branker, 142 F.3d 1294, 1298 (D.C.Cir.1998)("[T]he payment requirement of the PLRA never exacts more than 20% of an indigent prisoner’s assets or income.”) (emphasis added). But see D’Alfonso v. Holder, No. 09-1971(RBW), 2010 WL 604659 at *2 (D.D.C. Feb. 22, 2010) (declining to cap fees at twenty percent).

. The full statement of the Court's holding was as follows:
May a State, consistent with the Due Process and Equal Protection Clauses of the Fourteenth Amendment, condition appeals from trial court decrees terminating parental rights on the affected parent’s ability to pay record preparation fees? We hold that, just as a State may not block an indigent petty offender's access to an appeal afforded others, see Mayer v. Chicago, 404 U.S. 189, 195-96, 92 S.Ct. 410, 415-416, 30 L.Ed.2d 372 (1971), so Mississippi may not deny M.L.B., because of her poverty, appellate review of the sufficiency of the evidence on which the trial court found her unfit to remain a parent.
M.L.B., 519 U.S. at 107, 117 S.Ct. 555. See Lyon v. Krol, 127 F.3d 763, 765 (8th Cir.1997) (describing M.L.B. as "summarizing cases where court fees must be waived if they prevent litigants from vindicating basic fundamental rights.”). What the Fifth Circuit cites is the Court’s recognition "that a constitutional requirement to waive court fees in civil cases is the exception, not the general rule,” M.L.B., 519 U.S. at 114, 117 S.Ct. 555, a far cry from a description of a flat holding that "indigent persons have no constitutional right to proceed in forma pauperis.” Atchison, 288 F.3d at 181 (citing M.L.B., 519 U.S. at 119, 117 S.Ct. 555).

. The Eighth Circuit followed the Seventh Circuit's lead without elaboration. Lefkowitz v. Citi-Equity Group, Inc., 146 F.3d 609, 612 (8th Cir.1998).

. But see Roger Roots, Of Prisoners and Plaintiff’s Lawyers: A Tale of Two Litigation Reform Efforts, 38 Willamette L.Rev. 210, 221-22 (2002) (discussing examples of successful civil rights suits brought by pro se inmate-litigants).

. Indeed, although we have held that a released prisoner who complies with the PLRA while incarcerated will not be bound to pay outstanding fees after he is released, other circuits have ruled to the contrary. Compare DeBlasio v. Gilmore, 315 F.3d 396, 397 (4th Cir.2003) ("We hold that the PLRA fee requirements are not applicable to a released prisoner (assuming the prisoner made any required payments while in prison) and that his obligation to pay filing fees is determined by evaluating whether he qualifies under the general in forma pauperis provision of 28 U.S.C. § 1915(a)(1)."), with Gay v. Texas Dep’t of Corrs. State Jail Div., 117 F.3d 240, 241 (5th Cir.1997) (“We hold that a person who files a notice of appeal while in prison is subject to the filing-fee requirements of the PLRA despite subsequent release from prison.”).

. District courts in the Sixth and Ninth Circuits have also followed the "per case” interpretation of § 1915. See Hendon v. Ramsey, 478 F.Supp.2d 1214, 1219 (S.D.Cal.2007) (adopting the Fifth Circuit’s reasoning in Atchinson that § 1915 requires a “per case” withdrawal of fees); Samonte v. Frank, 517 F.Supp.2d 1238, 1243 (D.Haw.2007) (finding *245 that the “per case” interpretation of § 1915 was a more practical interpretation); Lyon v. Kentucky State Penitentiary, No. 5:02CV-P53-R, 2005 WL 2044955 at *1 (W.D.Ky. Aug. 23, 2005) (recognizing that the Sixth Circuit has not directly addressed this issue, but finding that the Sixth Circuit implicitly adopted the "per case” interpretation in McGore v. Wrigglesworth, 114 F.3d 601 (6th Cir.1997)); Suggs v. Caballero, 2007 WL 541909 at *1 (E.D.Mich. Feb. 16, 2007) (disagreeing that the Sixth Circuit implicitly adopted the "per case” interpretation, but adopting the "per case” interpretation because it is a “better interpretation”). Neither the Sixth Circuit nor the Ninth Circuit have directly addressed the issue.

. District courts in the First and Third Circuits have adopted Whitfield’s "per inmate” interpretation for the collection of filing fees from prisoners, though neither circuit has addressed the issue directly. See Lafauci v. Cunningham, 139 F.Supp.2d 144, 147 (D.Mass.2001) (finding that a "per case” interpretation could possibly present a problem by denying inmates access to the courts); Fortune v. Patterson, No. 04-377, 2009 WL 3166274 at *4 (W.D.Pa. Sept. 28, 2009) (holding that § 1915 mandates that filing fees are deducted from a prisoner’s monthly income at a rate not greater than 20 percent).

. We need not go so far, however, for here the question is whether the monthly payments required by § 1915(b)(2) may be collected sequentially or must be collected simultaneously. No issue is presented as to whether an initial “partial payment" of filing fees must be withheld for every case and every appeal.

. Although it is true that the number of suits brought by prisoners has increased, there is no indication that the increase has significantly outpaced the increase in the number of people incarcerated in this country nor have the reasons for the increase in claims been established.... A list of reasons for any increase in the number of complaints over a simple increase in the number of prisoners would likely include the high incidence of prison overcrowding, a lack of carefully trained correctional officers, and inadequate and frequently unfair internal grievance procedures.
Lyon v. Krol, 127 F.3d 763, 766 n. 6 (8th Cir.1997) (Heaney, J., dissenting).

. There have been many instances where courts have found abuses in prisons that were constitutional violations that may not have resulted in imminent danger of serious physical injury or death. See Hope v. Pelzer, 536 U.S. 730, 737, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (holding that handcuffing a prisoner to a hitching post for seven hours without regular water and bathroom breaks was unconstitutional); Helling v. McKinney, 509 U.S. 25, 33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (finding that exposing prisoners to tobacco smoke that posed an unreasonable risk of serious damage to future health could be considered a constitutional violation); Smith v. Ozmint, 578 F.3d 246, 253-54 (4th Cir.2009) (finding that a prison policy that forces inmates to cut or shave their hair is a violation of genuinely held religious beliefs).

. In fashioning its extra-statutory term "installment payments,” the dissent commits the very infraction of which we are said to be guilty: that by construing the monthly payment provision as we do, we are inappropriately inserting a word ("cap”) into the statute. See Dissenting Op. at 253-55 (citing Lamie v. United States Tnistee, 540 U.S. 526, 538, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004)). But this is not accurate. The circumstances arising from statutory silence we find present here are "familiar,” and simply require that we construe a statute "where Congress has enacted a law that does not answer 'the precise question at issue.’ ” Lopez v. Davis, 531 U.S. 230, 242, 121 S.Ct. 714, 148 L.Ed.2d 635 (2001).

. See Julia Colaruso, Comment, Out of Jail But Still not Free to Litigate? Using Congressional Intent to Interpret 28 U.S.C. § 1915(B)’s Application to Released Prisoners, 58 Am.U.L.Rev. 1533, 1544 n.61 (2009) (citations omitted):
[S]ome courts review the petitioner's IFF application while simultaneously deciding the merits of his claim.... Under this approach, the court automatically denies IFP status upon a finding that the claim is frivolous or malicious and thereby dismisses the *250 case.... Courts utilize the one-step procedure in part because it "helps minimize the drain on public funds and judicial resources that in forma pauperis litigants might otherwise cause.”

. Even if we grant the existence of a few of the dissent's hypothetical inmates who, like the Fifth Circuit’s hypothetical Texas inmate, are "free to file a § 1983 action against the President in the District of Columbia,” see Atchison, 288 F.3d at 181, and who thus file cases in different federal district courts, such speculation provides scant reason to apply the statute as the dissent would. As we observe, supra pp. 242-43, corrections officials are suitably equipped to handle such outliers by remitting withheld inmate funds to the appropriate courts sequentially.

. The dissent’s reliance on Roller v. Gunn, 107 F.3d 227, 231-33 (4th Cir.1997), is misplaced. Unlike the appellant in that case, Torres does not contend that the imposition of filing fees on inmates violates the constitution. Rather, he contends, as the Second Circuit has found, that the pyramiding of the monthly payments required by § b(2) poses an avoidable risk that a constitutionally-cognizable impediment to an inmate's access to courts could result. Roller did not purport to address this issue.

. Notably, in enacting the PLRA to address the increase in litigation arising in the prison setting, Congress imposed not only (1) filing fees and (2) the "three-strikes” rule already discussed, but it also (3) “invigorated the exhaustion prescription” required of prisoners bringing claims under 42 U.S.C. § 1983, by imposing a mandatory exhaustion requirement that "differs markedly” from its predecessor. Porter v. Nussle, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Clearly, Congress knows how to address the problem of frivolous prisoner litigation.